852 So.2d 1213 (2003)
Patti Louanne Denmon POPE and John Pope, Plaintiffs-Appellees,
v.
Matthew L. PRUNTY and City of Shreveport, Defendants-Appellants.
No. 37,395-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 2003.
*1215 Rountree, Cox, Guin & Achee by Dale G. Cox, Shreveport, for Appellants, Matthew L. Prunty and the City of Shreveport.
Hicks, Hubley and Marcotte by Craig O. Marcotte, Shreveport, for Intervenor-Appellee State Farm Mutual Auto Insurance Co.
Rice & Kendig by William F. Kendig, Shreveport, for Appellees.
Before STEWART, MOORE and TRAYLOR (Pro Tempore), JJ.
MOORE, J.
Officer Matthew Prunty ("Prunty") and the City of Shreveport ("City") appeal a judgment finding Prunty solely at fault in an intersectional collision with the plaintiff, Patti Louanne Denmon Pope ("Pope"). Prunty and the City also contest the rejection of their reconventional demand that Pope was comparatively negligent. Finding no manifest error on the issue of negligence, we affirm and remand for further proceedings.

Factual Background
During the morning of November 15, 1999, the Shreveport Police Department ("SPD") received a report of a sexual assault at the Fairfield Oaks Apartments on Fairfield Avenue. Two SPD officers, Dews and Vines, were already en route when Prunty received the dispatch regarding the sexual assault matter. Unbeknownst to Prunty, the assault complaint was canceled before Dews and Vines made it to the scene.
*1216 At the time Prunty received the dispatch, he was driving his cruiser south on Fairfield, around the Hollywood Avenue intersection; he pulled into a parking lot on his left, turned around and re-entered Fairfield. Fairfield in this area is an asphalt, two-lane road running north and south with no shoulders or neutral ground, with double-striped yellow "no-passing" lines and a posted speed limit of 35 mph. In this section of Fairfield, the northbound lane is much narrower than the southbound lane. Between Hollywood and Ockley Drive ("Ockley"), Fairfield runs through a residential area on both sides with two neighborhood schools and a public park immediately adjacent. There are no traffic lights until a yellow caution light appears at the westside t-intersection with Ockley. Trabue Street intersects Fairfield between Hollywood and Ockley and marks the crest of a hill on Fairfield.
Driving north on Fairfield, Prunty deployed his overhead bar lights, his wigwag lights and was manually pressing his air horn intermittently; he did not employ his siren. At the same time, Patti Pope was also driving north on Fairfield, slowing down to make a left turn at Ockley. Several cars were waiting behind her; Prunty testified that about a dozen vehicles in the northbound lane scooted to the right to allow him to pass as he crested the hill and neared Ockley. Two of these drivers, Rhonda Martinez ("Martinez") and Myrtis Edwards ("Edwards"), testified the police car was traveling north in the southbound lane. Edwards also testified that her vehicle was immediately behind Pope's car and that she observed Pope initiating a left turn on to Ockley with her left turn signal on. Edwards further testified that as the police officer passed her she did not hear any warning sound and that the police car was traveling "faster than normal."
Edwards gave a written statement to the SPD stating that Prunty was driving at a high rate of speed. Edwards also testified that when she first turned on to Fairfield from a side street north of Ockley, she looked to the left and did not see a police car. However, once she began driving on Fairfield, she saw the police car in her rear view mirror. Edwards also testified that she saw Pope turning left at the time the police car struck Pope's car and that Pope must have panicked when Pope observed the police car closing upon her vehicle. Martinez's testimony was confused in part as she testified that she heard a "siren" and saw police car lights and that she saw Pope turning left from Ockley on to Fairfield and traveling north when Prunty collided his cruiser with Pope's vehicle. Martinez testified that she first saw Prunty's police car after he topped the hill on Fairfield. Martinez did not recall Edwards' vehicle between her vehicle and Pope's car. Martinez further testified that the police car appeared to be traveling very fast when he passed her.
Prunty suddenly saw that Pope was starting to make a left turn, with the front of her car in the southbound lane, when Prunty slammed on his brakes, steered his cruiser to the right across the center lines and skidded roughly 106 feet. The left front quarter panel of his cruiser slammed into the left rear quarter panel of Pope's Lexus, totaling both vehicles.
On direct examination, Prunty testified that immediately prior to braking, he observed Pope's vehicle turning left and then began to drift back to the right as though Pope changed her mind regarding the left turn. Then, on cross-examination, Prunty testified that after he hit his brakes, he observed Pope's vehicle turn to the left after drifting to the right.
Al Gonzales ("Gonzales"), who was accepted and testified as an expert for Pope *1217 in the fields of collision analysis, human factors and police tactical driving, policy and procedure, testified that the physical evidence showed that Prunty was driving 63-64 mph, pre-skid, which was too fast to stop within the 106 feet range of the resulting skid marks left by Prunty's cruiser.
Prunty's expert Captain James Hilton ("Hilton") was accepted in the limited area of emergency police driving response, and testified based solely on information obtained from Prunty, that Prunty's pre-skid speed was approximately 40-45 mph. On cross-examination, Hilton admitted that he did not take all scientific factors into consideration in reconstructing Prunty's pre-skid speed and that he did not disagree with Gonzales's estimation of Prunty's pre-skid speed after viewing Gonzales's computer simulations which considered all scientific factors to determine speed.
Gonzales further testified that, when traveling in the range of 60-64 mph, it would take approximately 300 feet for Prunty's cruiser to come to rest. Gonzales also presented five computer simulations of the instant collision, including a 48 mph speed factor up through a 64 mph speed factor for Prunty and factoring in the post-impact vehicle trajectory and post-impact resting places of the vehicles. Gonzales testified that the simulations showed that if Prunty had been traveling 48 mph pre-skid, his cruiser would have come to rest before any impact with Pope's car. Gonzales further testified that the simulation which most clearly matched the vehicles' final resting positions, considering the length of the skid marks, showed that Prunty was traveling in the pre-skid range of around 64 mph and struck Pope's vehicle in a manner physically consistent with her making a left turn at the time of impact.
Pope sustained head trauma and other physical injuries. Because she lost consciousness from the collision, she has no significant recollection of the impact or the events immediately preceding or following it. Prunty also sustained physical injuries from the collision.

Action of the Trial Court
At the close of the liability phase of this bifurcated trial, the district court rendered a comprehensive written ruling. The trial court explicitly accepted the testimony of Edwards and a homeowner, Ms. Deborah L. Caple ("Caple"), who resides on Fairfield in the area of the collision. Caple testified she heard no audible sounds from Prunty's cruiser prior to the collision; the court did not accept the contrary testimony of Martinez since she left the accident scene and failed to report her observations until months later after she was involved in an accident. The court found that the investigating officer, Lt. Margie Fields, conducted an inadequate investigation of the accident by interviewing only one witness and failing to note the resulting damage to the vehicles; however, the court accepted her conclusion that driving 60 mph on Fairfield was too fast and that Prunty should have been using his lights and siren. Lastly, the trial court accepted the testimony of plaintiff's expert, Gonzales, as based on a thorough scene investigation, sound and legitimate methodology, and because Gonzales's computer simulations were consistent with the facts and applied science surrounding the collision. The trial court gave less weight to the City's expert, Hilton.
The trial court found that the conduct of Prunty in the instant response must comply with subsections A, B and C of R.S. 32:24 (quoted infra) to benefit from a "gross negligence" standard of review. The trial court found that Prunty complied with subsection A, but that he violated subsections B and C. Specifically, the trial court found that, given the environmental *1218 circumstances existing on Fairfield at the time of the accident, 63-64 mph was too fast and that Prunty's excessive speed brought the citizens into peril of probable harm to their life or property and thus, violated subsection B.
The trial court also found that Prunty's actions, as established by Edwards and Caple, failed to provide an audible signal sufficient to warn motorists of his approach, thus violating subsection C. Specifically, Prunty could not have manually honked his air horn enough to warn Pope because he needed both hands to steer his police car down Fairfield at a high speed, weaving in and out of traffic. Because of the insufficient audible warning and excessive speed, the court concluded that Prunty's conduct would be evaluated by an ordinary negligence standard.
The trial court found Prunty 100 percent at fault, first by finding that he should have chosen Southern Avenue as his emergency response route, as it would have presented considerably less traffic and a safer route to Prunty's destination. Second, the court found Prunty negligent for not using his siren but instead manually deploying his air horn, requiring the use of one of his hands; this was not only insufficient, but also distracted from his attention and focus. Finally, the court found that driving 63-64 mph, some 20 mph over the posted speed limit, in the conditions present on Fairfield, was simply too fast and caused Prunty to be unable to stop in time to avert the collision.

Standard of Review
An appellate court may reverse the findings of the trial court only when a reasonable factual basis does not exist for the finding and the finding is clearly wrong or manifestly in error. Stobart v. State, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989); Thomson v. Thomson, 34,353 (La.App. 2 Cir. 1/24/01), 778 So.2d 736. Though an appellate court may surmise that its own evaluations and inferences are reasonable, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Goings v. State, 94-1386 (La.1/17/95), 648 So.2d 884; Thomson v. Thomson, supra. When findings are based on determinations regarding the credibility of witnesses, the manifest error standard accords great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what was said. Where a fact finder's conclusion is based on its decision to credit the testimony of one of two or more witnesses, that determination can virtually never be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 845; Thomson, 778 So.2d at 738.
The task of the reviewing court is not to assess whether the trial court's factual findings are right or wrong in an absolute sense, nor to determine whether the court of appeal or another trier of fact might reasonably reach a different conclusion from the same evidence, but solely to ask whether this fact finder's resolution of the conflicting evidence was reasonable in light of the record as a whole. See, Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733.

Discussion
In this appeal, Prunty has assigned 20 errors and 16 issues which we have consolidated by commonality of analysis for brevity.

The Applicable Standard of Care under La. R.S. 32:24
The driver of an emergency vehicle is accorded particular driving privileges *1219 when responding to an emergency call. La. R.S. 32:24 A. These privileges include exceeding the maximum speed limits "so long as he does not endanger life or property." R.S. 32:24 B(3). However, this privilege applies "only when such vehicle is making use of audible or visual signs sufficient to warn motorist of [its] approach, except that a police vehicle need not be equipped with or display a red light visible from the front of the vehicle." R.S. 32:24 C; Lenard v. Dilley, XXXX-XXXX (La.1/15/02), 805 So.2d 175, 179.
Finally, these special driving privileges do not "relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provision protect the driver from the consequences of his reckless disregard for the safety of others." R.S. 32:24 D; Lenard, supra.
In effect, R.S. 32:24 D sets out two standards of care for emergency vehicle drivers, depending on the circumstances. If, and only if, an emergency vehicle driver's actions fit into subsections A, B and C, will an emergency vehicle driver be held liable only for his actions which constitute reckless disregard for the safety of others. On the other hand, if the emergency vehicle driver's conduct does not fit subsections A, B and C, such driver's actions will be gauged by an ordinary negligence standard. Lenard at 178.
A breach of the duty to drive with due regard for the safety of others as set forth in R.S. 32:24 by an emergency responder driver will result in a finding of actionable negligence on the part of the driver. Butcher v. City of Monroe, 31,932 (La.App. 2 Cir. 5/5/99), 737 So.2d 189, 193, writ denied, 99 1608 (La.9/17/99), 747 So.2d 566; United Bilt Homes, Inc. v. Schmitt, 29,837 (La.App. 2 Cir. 9/24/97), 699 So.2d 1167, 1168.

Prunty's Compliance with Subsection B(3)
Prunty contests the trial court's conclusion that he violated subsection B(3). He concedes that he was exceeding the posted 35 mph speed limit and driving on the wrong side of the road. However, he urges that the true cause of the accident was his emergency response to the sexual assault call, thus satisfying the requirements of R.S. 32:24 B and Lenard, supra. Prunty elaborates that under the trial court's erroneous analysis, no emergency responder who is involved in an accident in which someone is hurt or property damaged will ever be able to comply with the provisions of R.S. 32:24 B(3).
This argument is without merit and was properly disposed of by the Louisiana Supreme Court in Lenard, when the Court rejected the application of a reckless disregard standard in all situations for emergency responders:
Just because an individual happens to be an emergency vehicle driver, does not automatically relieve him from liability for ordinary negligence. To hold otherwise would have the effect of severely endangering the public safety, as emergency vehicle drivers could at all times engage in ordinary negligent behavior and be shielded from the consequences of their actions. Lenard at 180, 181.
R.S. 32:24 B(3) required Prunty not to endanger life or property in exceeding the speed limit by roughly 20 mph under the environmental circumstances existing that morning. If he failed to do so, then he is subjected to liability for his ordinary negligence in disregarding the safety of others. See, Lenard, supra.
Based on the testimony of Gonzales, as well as the demonstrative evidence of Prunty's excessive speed, and upon the record, the trial court was entitled to find *1220 that Prunty's driving, in the conditions then present on Fairfield, endangered life or property. The finding of a violation of subsection B is not clearly wrong or manifestly in error. It is therefore affirmed. See, Stobart, supra; Butcher, supra; United Bilt Homes, Inc., supra.

Prunty's Compliance with Subsection C
Prunty next urges on appeal that the trial court erred in concluding that he failed to make use of audible signals sufficient to warn motorists. It is undisputed that Prunty failed to use his siren within his police cruiser during the instant response, and instead, opted to manually deploy his air horn and activate his overhead and wig-wag front light systems.
It is not enough for us to determine whether or not Prunty's choices in deploying the chosen warning devices were "sufficient," as required by subsection C. The fundamental question is whether the record supports the trial court's finding that they were insufficient to warn Pope of the impending collision. First, the trial court found based on Gonzales's expert testimony that Prunty was traveling 63-64 mph, pre-skid; this is a patently unreasonable speed to protect against danger to life or property as Prunty approached Ockley, particularly given the environmental circumstances existing on Fairfield. Next, the trial court found that Prunty's actionsdriving at excessive speed, weaving in and out of the southbound lane, and using one hand to punch his air horn as opposed to his hands-free sirenwere human errors resulting in insufficient warning to Pope to avert the imminent collision.
Pope's expert Gonzales testified that, based upon his analysis and computer simulations of the accident scene, Pope probably did see Prunty during her left turn on to Ockley, but because Prunty was traveling at such a high speed and without applying his siren, his warning came too late, causing Pope to stall in a state of panic. Thus, Pope found herself in an inescapable position at the moment she first observed Prunty, which was too late. This opinion was corroborated by Edwards, who testified that, from her perspective, Pope saw Prunty while she was making her left turn and could not get out of the way. As noted earlier, another witness, Caple, who resides on Fairfield near the intersection with Ockley, testified that she was at home at the time of the accident, and did not hear any air horn noise from Prunty's cruiser but was alerted to the accident by the skidding tires.
Therefore, we affirm the trial court's finding that Prunty's conduct violated subsection B by driving excessively fast in the oncoming traffic lane, using one arm and hand to depress the air horn, which was inherently distracting to Prunty, and not first ascertaining that it was safe to proceed as such. We also affirm the finding that Prunty violated subsection C by failing to employ his cruiser's siren while driving in this manner resulting in insufficient warning to Pope to avert the accident.[1]See, Butcher at 195, 196 supra; United Bilt Homes Inc., at 1168, 1169, supra; Shaw v. Globe Indem. Co., 134 So.2d 609 (La.App. 2 Cir.1961); Cassity v. Williams, 373 So.2d 586 (La.App. 3 Cir. 1979).
Based upon Prunty's violations of subsections B and C of R.S. 32:24, we affirm the trial court's conclusion that Prunty's conduct is subject to an ordinary negligence *1221 standard pursuant to Lenard, supra, and that Prunty violated his duties of care provided in R.S. 32:24 D, which subject him to liability for breach of ordinary care.

Comparative Fault of Pope
Finally, Prunty and the City argue that Pope failed to move to the right upon notice of his police cruiser's presence or otherwise take steps to avoid the collision. Specifically, Prunty and the City argue that the evidence adduced at trial showed that Pope should have heard and seen Prunty's cruiser upon his approach and yielded the right of way to him as did other motorists. Prunty and the City also argue that Pope was negligent in stopping in the middle of the road, turning her car when she had a duty to yield and failing to complete her turn prior to the collision.
The duty to yield the right of way to an emergency vehicle arises only when a motorist observes or hears, or under the circumstances should have observed or heard, the audible and visual warnings of such a vehicle. The burden of proving negligence of the non-yielding motorist rests on the party asserting the same. Butcher, supra, at 194, 195 citing Cassity, supra at 591; La. R.S. 32:125. Based on the record, the trial court implicitly found that Prunty failed to carry his burden of proof, given the evidence reflective of Prunty's violations of subsections B and C. Particularly, as noted above, the trial court was not clearly wrong in finding that Prunty's excessive speed made it impossible for Pope to avert the collision; the preponderance of the testimony reflected that at the time Pope first observed Prunty, it was too late. Thus, under the instant factual circumstances, Pope owed no duty under R.S. 32:125. We find that the trial court was not clearly wrong or manifestly in error in finding Prunty 100 percent at fault in the collision. See, Butcher, supra; United Bilt Homes, Inc., supra; Shaw, supra; Nelson v. State, 581 So.2d 344 (La. App. 3 Cir.1991); Cassity, supra; Natchitoches Motor Co., Ltd. v. Travelers Ins. Co., 372 So.2d 811(La.App. 3 Cir.1979); cf., Jackson v. Town of Grambling, 29,198 (La. App. 2 Cir. 2/26/97), 690 So.2d 942; Riggs v. State, 488 So.2d 443 (La.App. 3 Cir. 1986).

Conclusion
For the foregoing reasons, we affirm the judgment of the trial court in all respects. Appellate costs of $116.50 are assessed against the City of Shreveport and Matthew Prunty in accord with La. R.S. 13:5112.
AFFIRMED AND REMANDED.
NOTES
[1] We pretermit analysis as to whether SPD General Order 603.01 V(D) unconstitutionally expands La. R.S. 32:24 as urged by Prunty and the City on appeal, as we affirm that Prunty's use of his cruiser's air horn over his siren, was insufficient to warn Pope pursuant to R.S. 32:24 C.